**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**AVIO, INC.,** a Michigan corporation
individually and as the representative
of a class of similarly situated persons,

               Plaintiff,

                                       No. 2:10-cv-10221
vs.                                    Hon. Gerald E. Rosen

**ALFOCCINO, INC., D. TALIERCIO**
**INVESTMENTS, INC.** and
**FARSHID (TONY) SHUSHTARI,**

               Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO**
**<u>CERTIFY CLASS</u>**

**I. INTRODUCTION**

      This is a "junk fax" case arising out of Defendants' use of a third-party to

send advertisements via facsimile to numerous businesses in southeast Michigan.

Plaintiff's putative class action generally asserts that this third-party, Business-to-

Business Solutions (B2B), faxed over ten thousand advertisements on Defendants'

behalf in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227

(TCPA).  Presently before the Court are two Motions: (1) Plaintiff's Motion to

Certify Class (Plf's Mtn., Dkt. # 109); and (2) Defendants' Motion for Summary Judgment (Defs' Mtn., Dkt. # 117).  Having reviewed and considered the parties' Motions, respective responses and replies thereto, supplemental authority,[1] and the entire record of this matter, the Court has determined that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process.  Therefore, the Court will decide these matters "on the briefs."  See Eastern District of Michigan Local Rule 7.1(f)(2).  The Court's Opinion and Order is set forth below.

## II. PERTINENT FACTS

### A.    B2B Junk Fax Litigation across the Country

This litigation is but one of at least one hundred junk fax matters filed by Plaintiff's attorneys across the country involving facsimiles sent by B2B.  It is, to turn a phrase, not the first rodeo for these facts and legal issues.[2]  Judge Cox of this District expansively discussed this history in three nearly identical matters, which put this litigation into perspective:

---

[1] Since completing briefing, the parties have filed various supplemental authorities (and responses thereto) updating this Court on other B2B matters across the country.  (Dkt. ## 122, 126, 127, 128, 129, 130 and 131).

[2] Nor is it Plaintiff's first time advancing a B2B-related TCPA claim.  *See Avio v. Creative Office Solutions, Inc.*, 10-cv-10622, Dkt. # 31 (E.D. Mich. Dec. 10, 2012) (Roberts, J.) (approving class action settlement, with Plaintiff receiving $9,500 for serving as a class representative and $305 for each successful fax transmission, and its counsel receiving $529,000 in attorney's fees and $60,000 in expenses); *Avio v. Lulgjuraj*, 09-cv-14956, Dkt. # 9 (E.D. Mich. July 1, 2010) (Murphy, J.) (dismissing Plaintiff's complaint for lack of prosecution).

2

Anderson + Wanca and Bock & Hatch are two Chicago area law firms that specialize in representing plaintiffs in class action lawsuits under the Telephone Consumer Protection Act as amended by the Junk Fax Prevention Act of 2005 (the "TCPA"). The TCPA authorizes $500.00 in statutory damages for faxing an unsolicited advertisement, and each transmission is a separate violation. And the award triples upon a showing of willfulness. Because plaintiffs may enforce the statute via class action and because a single advertisement is often faxed to hundreds -- if not thousands -- of phone numbers, suits under the Act present lucrative opportunities for plaintiffs' firms.

A woman named Caroline Abraham functioned as a modern-day "typhoid mary" in the small business communities in which she operated. As the Seventh Circuit explained [in *Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489 (7th Cir. 2013)], Abraham and her company, Business–to–Business Solutions ('B2B') sit at the center of this lawsuit and scores of others: B2B contracted with businesses to send advertisements via facsimile. Advertisers would pay a fee, and B2B would send the ad to hundreds of fax numbers purchased from InfoUSA, Inc. (a practice known as "fax-blasting"). Abraham, B2B's sole employee, never obtained from the fax recipients['] permission to send them the advertisements.

\* \* \*

Anderson + Wanca came across B2B and Abraham while they were investigating four putative class actions in Illinois. They learned that the defendants in those four cases had contracted with B2B to fax the offending advertisements. Unsurprisingly, Caroline Abraham's B2B records became the focus of discovery. Abraham ultimately produced spreadsheets in discovery that listed only the recipients of the advertisements at issue in the four cases.

\* \* \*

Flush with success, Anderson + Wanca recognized that the B2B hard drives and fax lists likely contained a treasure trove of potential clients for putative class action lawsuits. So, despite having all information necessary to certify the classes in the Four Cases, Anderson + Wanca continued pushing Caroline Abraham to disclose

3

all B2B fax transmission data.  Ryan Kelly, an attorney at Anderson + Wanca, met with Caroline Abraham and asked her for the actual back-up disks and hard drive.  He told her that "nobody would look at anything on these media not related" to the Four Cases.  Indeed, Kelly even emailed Ms. Abraham a copy of the protective order filed in one of the Four Cases, explaining that it "will prevent [Kelly] from disclosing any of the back-up disks or hard drive to any third-party." To receive those protections, however, the producing party had to stamp documents confidential or notify plaintiff's counsel of their confidential nature at the time of production.  Ms. Abraham continued to resist.

Ultimately, plaintiff's counsel subpoenaed Joel Abraham to testify at a deposition.  The subpoena also ordered Mr. Abraham to produce, at the time of his deposition, the back-up disks and hard drive. Appearing at the deposition with attorney Eric Ruben, Joel Abraham produced the materials.  Neither he nor Ruben, who had read the protective order, asserted confidentiality.  Even so, Anderson + Wanca later instructed defense counsel to "treat the DVD produced by Joel Abraham as confidential pursuant to the protective order[.]"

The back-up disks and hard drive revealed not only the recipients of fax advertisements sent by the defendants in the Four Cases but the names of other B2B clients as well.

Then, armed with data from B2B's electronic files, Plaintiff's counsel filed scores of putative class actions under the TCPA.  The B2B files provided a treasure trove of potential new clients for Anderson + Wanca, revealing the names of other potential defendants who contracted with B2B to send unsolicited fax advertising and listing the recipients of that advertising. . . .   Anderson + Wanca attorneys have filed *over one hundred* putative class actions under the Act, all rooted in data recovered from the B2B disks and hard drive.

*APB Associates, Inc. v. Bronco's Saloon, Inc.*, 297 F.R.D. 302, 304-06 (E.D. Mich. 2013) (Cox, J.) (internal citations and quotations to *Reliable Money Order* omitted); *see also Compressor Eng'g Corp. v. Mfg. Fin. Corp.*, 292 F.R.D. 433

4

(E.D. Mich. 2013) (Cox, J.); *Machesney v. Lar-Bev of Howell, Inc.*, 292 F.R.D. 412 (E.D. Mich. 2013) (Cox, J.).[3]

## B.  Pertinent Facts Regarding Plaintiff's Claim in This Litigation

This case involves a fax campaign by B2B[4] on behalf of two Alfoccino restaurants located in Auburn Hills and Farmington Hills on two separate occasions in 2006.  Defendant Farshid Shushtari was responsible for Alfoccino's marketing and advertising.  (Ex. D to Plf's Class Mtn., Dkt. # 109-4, at 10, 80).  In 2006, B2B contacted Alfoccino -- ironically through Alfoccino's fax machine -- advertising its services.  (*Id.* at 12-13).  Shushtari responded, and eventually engaged B2B to send 20,000 advertisements via fax, split between delivery dates in November and December 2006.  (*Id.* at 64-65).  The content of these ads are immaterial.

What is material is to what numbers were the facsimiles to be sent, and who made this decision?  As to the latter, it was a combination of both Shushtari and B2B.  Shushtari provided B2B with a target area for these ads -- he wanted to

---

[3] Though not pertinent here given this Court's conclusion that Defendants are entitled to summary judgment, numerous courts have examined counsels' "questionable conduct" -- obtaining B2B's information, soliciting potential class representatives, and sending Caroline Abraham a $5,000 check for witness compensation -- in the context of appointing class counsel under Federal Rule of Civil Procedure 23(g).  *See, e.g., APB Associates*, 297 F.R.D. at 306-07, 313-14.

[4] Caroline Abraham used a variety of different d/b/a's to facilitate the junk fax scheme, including B2B, Maxileads, and Marketing Research Center.  (Ex. 3 to Defs' Mtn, Dkt. # 117-3, at 15-18).  For ease, the Court refers to all of these entities as B2B.

advertise in Southeast Michigan around the two Alfoccino restaurants. (*Id.* at 33-34). As to the former, B2B had obtained a list of fax numbers from a company called InfoUSA (Ex. A to Plf's Class Mtn., Dkt. # 109-1, at ¶ 7) and then culled this list based upon Shushtari's geographical restrictions (based upon zip codes) to create the final distribution list. (Ex. B to Plf's Class Mtn., Dkt. # 109-2, at 51-53; Ex. D to Plf's Class Mtn., Dkt. # 109-4, at 68-70). B2B represented to Shushtari that this list was composed of individuals who were willing to accept fax advertisements:[5]

> Q:  Did you or anyone else at Alfoccino's or at [B2B] contact anyone whom they were going to send faxes to before they were sent seeking permission?
>
> A:  As much as I know they had the list, and the reason they had the list is because they asked those questions from those numbers and that's why they had the numbers.
>
> Q:  And it's your understanding that the list that [B2B] had was a list of people who were willing to accept fax advertisements; is that correct?
>
> A:  Exactly.
>
> Q:  They told you that?
>
> A:  Of course.

(*Id.* at 34-35; *see also id.* at 76). Shushtari also testified that he would not have

---

[5] Such a representation is consistent with Shushtari's experience with the fax advertisement company whom Shushtari engaged prior to B2B. (Ex. D to Plf's Class Mtn., Dkt. # 109-4, at 73).

6

engaged B2B had he known that the facsimiles did not comply with the TCPA:

Q:   Did you knowingly authorize any fax advertisement that would be in violation of any laws?

A:   If I knew I would not have advertised.  The answer is no.

Q:   Because you wouldn't have done that, right?

A:   I wouldn't have done that.

Q:   If someone would have explained to you that there is this statute, the [TCPA], and the faxes we propose sending for you could possibly violate that law you wouldn't have agreed to send them, right?

A:   Exactly.

Q:   You were shown a lot of documents [during your deposition] that purportedly came from . . . Business To Business . . . , right?

A:   Yes.

Q:   There was a hotline number at the bottom of some of those documents, right?

A:   Yes.

Q:   Was your understanding in any of the fax advertisements that your company ever engaged in regardless of the company that because of those hotlines [allowing recipients to opt-out of receiving faxes] and maybe any efforts to get permission that those faxes would only be sent to companies, individuals that wished to received them?

A:   That's exactly was what I understood.

(*Id.* at 75-76).

B2B ultimately sent these facsimiles in exchange for $468.00. (Ex. B to Plf's Class Mtn., Dkt. # 109-2, at ¶ 7). The problem for Defendants, however, is that this $468.00 business expense turned into a legal nightmare; B2B had not actually sought or obtained prior permission before faxing the advertisements. (Ex. 1 to Plf's Class Mtn., Dkt. # 109-1, at ¶ 7). In other litigation, Abraham testified that she "felt bad" for her clients because "they didn't think they were doing anything wrong." (Ex. 3 to Defs' Mtn., Dkt. # 117-3, at 206-07).

Plaintiff *apparently* received fax advertisements for Alfoccino. "Apparently," because Plaintiff's representative has no knowledge of actually receiving Alfoccino's advertisements:

> Q:   Do you recall when it was that you received this advertisement discussing the Alfoccino Restaurants?
>
> A:   No.
>
> Q:   Do you remember what year it was?
>
> A:   No.
>
> Q:   Do you remember how many advertisements you received from Alfoccino?
>
> A:   No.
>
> Q:   Do you remember the substance of the advertisement?
>
> A:   No.
>
> Q:   Would you have been the person that got the Alfoccino ad off the fax machine?

A:      I would have been.

(Ex. 6 to Defs' Mtn., Dkt. # 117-6, at 20).  Plaintiff has also not produced an original fax of the Alfoccino advertisement, despite testifying that it was Plaintiff's policy to keep all "unwanted facsimiles" from local Michigan companies.  (*Id.* at 21-24).

Instead, Plaintiff offers an analysis of the B2B hard drive by its expert, Robert Biggerstaff,[6] that shows B2B faxed Alfoccino's advertisements a total of 13,980 times to 7,625 different fax numbers on two different days in 2006.  (Ex. C to Plf's Class Mtn., Dkt. # 109-3, at ¶ 17).  More specifically, B2B's "log file . . . shows that 6,887 transmissions were successful and error-free transmissions of a 3-page fax" on November 13, 2006.  (*Id.* at ¶ 15).  "This log file also shows that 7,093 transmissions were successful and error-free transmissions of a 1-page fax" on December 5, 2006.  (*Id.* at ¶ 16).  According to Biggerstaff, Plaintiff received a successful error-free fax transmission to its fax machine on both November 13, 2006 and December 4, 2006.  (*Id.* at Exs. 3 & 4).[7]  Biggerstaff's report is the *only*

---

[6] Biggerstaff has provided his analysis and opinions for numerous plaintiffs in other B2B cases, including in this District.  *See, e.g, Exclusively Cats Veterinary Hosp. v. Anesthetic Vaporizer Servs., Inc.*, 2010 WL 5439737, at *2 (E.D. Mich. Dec. 27, 2010) (Tarnow, J.).

[7] The November 13, 2006 "3-page fax" was comprised of one page advertising Alfoccino and two pages that have nothing to do with Alfoccino -- one promotes a fax advertisement business and one promotes a cash advance business.  (Ex. C to Plf's Class Mtn., Dkt. # 109-3, at Ex. 2-1).  B2B's use of the two non-Alfoccino

evidence upon which Plaintiff relies to establish TCPA liability.

## III. DISCUSSION

### A.   Rule 56 Standard

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In addition, where a moving party -- here, Defendants -- seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

---

documents raises interesting questions concerning scope of authority and class certification issues: Are Defendants liable for a fax B2B sent on their behalf even though two-thirds of the content was clearly not "on their behalf?" What implications does this raise for purposes of evaluating commonality, typicality, and predominance under Federal Rule of Civil Procedure 23(a)(2-3) and (b)(3)? Given the Court's conclusion regarding standing and vicarious liability below, however, consideration of these questions will be left for another day.

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed."  Fed. R. Civ. P. 56(c)(1).  But, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment."  *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

## B.   Defendants are entitled to Summary Judgment

Defendants present two arguments as to why they are entitled to summary judgment.  First, Defendants claim that because Plaintiff's alleged injury is only predicated upon Biggerstaff's analysis of B2B's hard drive, Plaintiff cannot establish an injury sufficient to satisfy Article III standing.  Second, Defendants claim that Plaintiff cannot establish vicarious liability under the TCPA because it failed to plead vicarious liability and because B2B's actions were outside the scope of its authority.  The Court discusses each in turn.

### 1.   Plaintiff's Article III Standing

When faced with a question of subject matter jurisdiction, a court must address that issue before all others.  *Gross v. Hougland*, 712 F.2d 1034, 1036 (6th Cir. 1983); *Moir v. Greater Cleveland Reg'l Transit Auth.,* 895 F.2d 266, 269 (6th

11

Cir. 1990) (citing *Bell v. Hood,* 327 U.S. 678, 682 (1946)). The "irreducible constitutional minimum" of standing requires that Plaintiff show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)). Judge Cox recognized in *APB Associates* that "there is a surprising lack of case law as to who has statutory standing to pursue a TCPA [claim] based upon the receipt of an unsolicited fax advertisement." 297 F.R.D. at 317. The same can be said for whether a plaintiff with no independent knowledge of a violative fax has actually suffered an injury in fact sufficient to satisfy Article III standing.

"The 'well established' law of Article III standing requires a plaintiff to '*allege personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir. 2012) (citations omitted and emphasis added). Here, proof of Plaintiff's injury is grounded outside of its own personal knowledge: it does not recall receiving, nor has been able to produce a copy of, the alleged facsimiles at issue. Instead, and like so many other B2B cases, Plaintiff

relies solely upon Biggerstaff's analysis of the B2B hard drive.

In this regard, a recent decision from the Southern District of Florida is instructive. *Palm Beach Golf Ctr-Boca, Inc. v. Sarris,* --- F. Supp. 2d ---, 2013 WL 5972173 (S.D. Fla. 2013), presented identical facts to the facts at issue in this matter. B2B sent thousands of facsimiles on behalf of a dental practice. *Id.* at *1. The plaintiff allegedly received one of those facsimiles, retained Plaintiff's counsel, and commenced litigation predicated solely upon Biggerstaff's analysis to establish a TCPA claim. *Id.* at *2-3. "Notably" -- and quite similar to this matter -- despite the fact that the plaintiff had instructed employees to keep unsolicited facsimiles, the plaintiff did "not remember ever seeing a fax from [the] dental practice, [did] not have any knowledge that [it] ever received a fax sent on behalf of [the] dental practice, and [could not] identify any [of its] records or employees that could establish receipt of such a fax." *Id.* at *2.

Upon this set of facts, the *Palm Beach Golf* court concluded that the plaintiff could not show an injury in fact sufficient to establish Article III standing. In so holding, the court made certain to distinguish between what the TCPA prohibits and to whom Congress intended to deliver a remedy:

> In conjunction with its prohibition on sending an unsolicited fax advertisement, the TCPA . . . contemplates that the fax advertisement have a "recipient." In the prohibition provision alone, the statute states that it is unlawful to send a fax advertisement "if the *recipient* is in the United States" and goes on to mention the "recipient" five more times. *See* 47 U.S.C. § 227(b)(1)(C) (emphasis added). In so doing,

13

> Congress recognized that only a recipient could suffer the injury the TCPA was intended to address.
>
> While the TCPA provides that a person who sends a fax advertisement may be liable, nowhere in the statute does Congress express an intent to circumvent the requirement that a plaintiff have Article III case-or-controversy standing to bring a claim, which requires that the plaintiff demonstrate "a distinct and palpable injury to himself." *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Congress can enact a statute (such as the TCPA) that puts into place a "bounty" -- a reward -- for a plaintiff who assists in enforcing federal laws. *See Crabill v. Trans Union, LLC,* 259 F.3d 662, 665-66 (7th Cir. 2001). However, there still must be an injury for the plaintiff to recover under the statute. *See id.*

*Id.* at *12. The court also focused on the content-specific nature of the TCPA, as well as the fact that it is a consumer protection statute:

> First, the TCPA's prohibition on sending faxes is content-specific. Congress did not ban any unsolicited fax from being sent, just fax advertisements. 47 U.S.C. § 227(b)(1)(C). Presumably, a plaintiff must see a fax to discern whether it is an advertisement or not. Furthermore, it is well-settled that, in enacting the TCPA, the aim of Congress was to protect consumers' privacy rights. If a plaintiff does not see, know about, or otherwise become aware of an unsolicited fax advertisement, it is difficult to conceive how the plaintiff's right to privacy could be invaded by the fax advertisement such that the plaintiff is injured in fact.

*Id.* at *13 (internal citations omitted). Accordingly, concluded the *Palm Beach Golf* court, "Congress conferred a private remedy upon the *injured recipients* of a fax advertisement, not upon assignees of the alleged recipients." *Id.* at *12.

Based on this conclusion, the *Palm Beach Golf* court held that Biggerstaff's analysis alone was not enough to confer Article III standing:

14

Plaintiff does not proffer sufficient evidence to demonstrate it suffered a distinct and palpable injury to itself such that it has standing to bring a TCPA claim against Defendant. The only evidence in this case that a fax was ever sent or received is the Big[g]erstaff report, which states only that a one-page fax (of unknown content) was sent through an electronic handshake. Plaintiff's own evidence shows that [it] had no knowledge of receiving the fax in question, never saw it, and cannot identify any records or employees that could establish receipt of the fax. There is also no evidence that the fax ever printed, tied up Plaintiff's dedicated fax line, or caused any other possible injury. Any claim by Plaintiff that such an injury could have occurred is merely hypothetical, which is insufficient to withstand the standing inquiry.

\* \* \*

[T]o have Article III case-or-controversy standing to bring its TCPA claim, Plaintiff must have suffered a distinct and palpable injury. At this, the summary judgment stage, Plaintiff must have adduced enough evidence (and not merely allegations) for the Court to conclude that Plaintiff was injured in fact. There is no evidence that this Plaintiff was injured by receiving a fax advertisement from Defendant or that this Plaintiff's privacy was ever invaded by Defendant, as the TCPA contemplates. Accordingly, the Court lacks subject matter jurisdiction over Plaintiff's TCPA claim, and the claim must be dismissed.

*Id.* at *13 (internal citations omitted).

This Court wholly agrees with this analysis. As indicated by Judge Kathleen Williams in *Palm Beach Golf*, an "injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Warth*, 422 U.S. at 500 (1975) (citation omitted); *see also Beaudry v. TeleCheck Servs., Inc.*, 579 F.3d 702, 707 (6th Cir. 2009) ("Congress has the power to create new legal rights, including rights of action whose only injury-in-fact involves the

violation of that statutory right.'") (internal citations and alterations omitted). But even when an injury exists on the sole basis of a statutorily-created legal right, a plaintiff must be within the scope of the persons to whom a right of relief is given and show "a distinct and palpable injury to himself." *Id.* Congress most certainly has the power to create procedural rights, but "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). For the reasons set forth in *Palm Beach Golf*, this Court refuses to find that a plaintiff satisfies Article III's injury in fact requirement when all it knows about its alleged injury is based upon what someone else told it.

The Court is aware that this conclusion is contrary to other district court opinions in other B2B matters. In particular, Chief Judge Jerome B. Simandle of the District of New Jersey was recently critical of *Palm Beach Golf* in *City Select Auto Sales, Inc. v. David Randall Associates, Inc.* 296 F.R.D. 299, 309-10 (D.N.J. 2013).[8] *City Select* presents the familiar set of facts: the defendant engaged B2B to send fax advertisements; the plaintiff had no "information about, recollection of, or record of the faxes that he received from the [defendant];" and Biggerstaff's

---

[8] *See also C-Mart, Inc. v. Metro. Life Ins. Co.*, --- F.R.D. ---, 2014 WL 457580, at *3 (S.D. Fla. 2014) ("C-Mart alleges that the unsolicited fax it received was sent by Defendants and it is seeking damages because of that violation of its privacy under [the] TCPA. C-Mart has met its burden in showing that Defendants' conduct violated [the] TCPA, which is sufficient to confer standing upon it.").

analysis shows a "successful" fax sent to the plaintiff's fax machine. *Id.* at 304. In finding that the plaintiff did show an injury in fact, the court focused on the fact that the "[t]he TCPA 'does not specifically require proof of receipt.'" *Id.* at 309 (citation omitted). Rather, Biggerstaff's analysis provided "circumstantial proof of receipt," especially because it accounted for error messages and other ways to isolate only "successful" transmissions. *Id.*

In coming to this conclusion, the *City Select Court* focused on the TCPA's prohibition against the *transmission* of unsolicited facsimiles:

> The Court is also not persuaded by *Palm Beach Golf's* requirement that the plaintiff must attribute a specific injury, such as an unavailable fax line, to the unsolicited fax advertisement. The TCPA prohibits sending unsolicited fax advertisements; it does not prohibit the sending of unsolicited fax advertisements only when there are specific harms that a plaintiff can later identify. . . . The Plaintiff need not prove that he consumed toner or paper to show that his TCPA rights were invaded.
>
> In *Reliable Money Order, Inc. v. McKnight Sales Co., Inc.,* 281 F.R.D. 327, 331 (E.D. Wis. 2012), *aff'd,* 704 F.3d 489 (7th Cir. 2013), the defendant argued that the plaintiff lacked standing because the plaintiff was "completely unaware of ever having allegedly received" a facsimile advertisement from the defendant. The *McKnight Sales* court rejected this argument and held that "the fact that Reliable Money does not personally recall receiving the 'junk fax' is inconsequential because personal knowledge of receipt is not necessary under the TCPA. I therefore find that Reliable Money has standing. . . ." *Id.* This Court agrees. "In enacting the TCPA, Congress chose to make evidence of *transmission* of the facsimile sufficient for Article III standing by the plain language of the statute." *Bridgeview Health Care Ctr. Ltd. v. Clark,* 09–5601, 2013 WL 1154206, at *3 (N.D. Ill. Mar. 19, 2013) (emphasis in original). Moreover, "the TCPA damages provision was not designed solely to

> compensate each private injury caused by unsolicited fax
> advertisements, but also to address and deter the overall public harm
> caused by such conduct." *Texas v. Am. Blastfax, Inc.,* 121 F. Supp. 2d
> 1085, 1090 (W.D. Tex. 2000).

*Id.* at 309-10.

It is true that the TCPA prohibits the *transmission* of unsolicited facsimiles, but to focus on this prohibition as to *liability* (i.e., the merits) appears to confuse Article III standing with statutory standing. *Bond v. U.S.*, 131 S.Ct. 2355, 2362-63 (2011) (commenting that because "statutory standing and the existence of a cause of action are 'closely connected,' . . . the conflation of [statutory standing] and [Article III standing] can cause confusion"); *Roberts v. Hamer*, 655 F.3d 578, 580 (6th Cir. 2011) (discussing the problem of conflating Article III standing with statutory standing, the latter of which "asks 'whether *this* plaintiff has a cause of action under the statute[,]' is closely related to the merits inquiry (oftentimes overlapping it) and is analytically distinct from the question whether a federal court has subject-matter jurisdiction to decide the merits of a case") (citation omitted). As discussed in *Palm Beach Golf*, the TCPA's use of "recipient" defines the boundary around which Congress intended to create a legal right. This boundary does not include Plaintiff.

## 2. Defendants' Liability under the TCPA

For the sake of completeness, the Court now turns to Defendants' second argument -- even if Plaintiff did have Article III standing, the principles of

vicarious liability mandate the dismissal of Plaintiff's claims.  Defendants raise two vicarious liability issues: (1) Whether Plaintiff plead vicarious liability; and (2) Whether B2B acted outside the scope of its authority.  Because the Court concludes that the material facts show that B2B acted outside the scope of its authority and because courts around the country are divided in B2B matters regarding the adequacy of pleading vicarious liability,[9] the Court declines to address Defendants' attack on Plaintiff's pleading.

The applicable TCPA provisions governing sending unsolicited advertisements via facsimile are as follows:

> It shall be unlawful for any person . . .  to use any telephone facsimile machine, computer or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless --
>
> > (i) the unsolicited advertisement is from a sender with an established business relationship with the recipient;
> >
> > (ii) the sender obtained the number of the telephone facsimile machine through--
> >
> > > (I) the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or
> > >
> > > (II) a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile

---

[9] *Compare Imhoff Inv., LLC v. SamMichaels, Inc.*, 2014 WL 172234, at *4-5 (E.D. Mich. Jan. 15, 2014) (Battani, J.) *with Palm Beach Golf*, --- F. Supp. 2d ---, 2013 WL 5972173, at *6-8.

number for public distribution,

except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before such date of enactment; and

(iii) the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D),

except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E).

47 U.S.C. § 227(b)(1)(C). In interpreting this provision, the Federal Communications Commission has construed this to mean not just the person who sends a fax, but also the person "on whose behalf" a fax is sent. 47 C.F.R. § 64.1200(f)(1). Defendants do not dispute that they can be potentially liable under this "on behalf of" theory. Instead, Defendants argue that they are not liable for B2B's actions because B2B's actions were outside the scope of its authority under vicarious liability law. Plaintiff disagrees, arguing that the TCPA is a strict liability statute, and that even if vicarious liability applied, a question of fact exists as to B2B's authority. As set forth below, Defendants' position wins the day.

Until recently, the scope of "on behalf of" liability was unsettled. *Savanna*

20

*Grp., Inc. v. Trynex, Inc.*, 2013 WL 4734004, at *5 (N.D. Ill. Sept. 3, 2013) (collecting cases). This changed a few years ago in part due to a referral of a TCPA case from the Sixth Circuit in a telemarketing case to the FCC. *See, e.g., Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459 (6th Cir. 2010). The FCC's resulting declaratory ruling in *In re Joint Petition filed by Dish Network LLC*, 28 F.C.C. 6574 (2013) (Dish Network) addressed whether a "seller" -- not the person who "initiates" calls under the TCPA -- may be vicariously liable under federal common law agency principles under 47 U.S.C. §§ 227(b), 227(c) for violations committed by third-party telemarketers. Interpreting these provisions, the FCC *expressly rejected the notion that the TCPA is a strict liability statute* and "clarif[ied] that the[se] provisions . . . incorporate the federal common law of agency and that such vicarious liability principles reasonably advance the goals of the TCPA." *Id.* at 6587. Accordingly, the FCC found that a third-party may be liable under the TCPA for acts of another under broad agency principles -- formal agency, apparent authority, and ratification:

> The classical definition of "agency" contemplates "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." Potential liability under general agency-related principles extends beyond classical agency, however. A principal may be liable in circumstances where a third party has apparent (if not actual) authority. Such "[a]pparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the

21

principal."   Other principles of agency law may support liability in particular cases.   For example, a seller may be liable for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits.   Such ratification may occur "through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences."

*Id.* at 6584, 86-87 (quoting Restatement (Third) of Agency).

Plaintiff argues that *Dish Network* is not applicable to this case by noting that the statutory and regulatory language at issue in that matter -- the telemarketing provisions that reference "sellers" and "to initiate" -- are materially different than the junk-fax provisions that reference "senders" and "to send." *Compare* 47 C.F.R. § 64.1200(f)(9) ("The term seller means the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."), *with* 47 C.F.R. § 64.1200(f)(10) ("The term sender for purposes of paragraph (a)(4) of this section means the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement."). *Dish Network* cannot be read so narrowly.   This is a well-worn argument made by Plaintiff's counsel in other B2B matters, and one that courts have rejected. *See Palm Beach Golf*, --- F. Supp. 2d ---, 2013 WL 5972173, at *6 & n.13 (noting that *Dish Network* rejected the argument that "since an FCC regulation defined 'sender' for purposes of a TCPA violation as the person on whose behalf a broadcaster

sends a fax, Plaintiff's right of action arises directly from the provisions of the TCPA and not common law principles of agency"); *Imhoff Inv.*, 2014 WL 172234, at \*6 ("Even though the FCC's declaratory ruling addressed the definition of seller within the telemarketing context, not sender within the faxing context, the definitions are similar and the ruling has been applied to senders as well."); *Savanna Grp.*, 2013 WL 4734004, at \*5 ("Given the substantial similarity between the definitions of 'seller' and 'sender' and the broad language of the ruling concerning violations of § 227(b), [*Dish Network*] is controlling in this case."). These decisions are persuasive and *Dish Network* therefore applies to Plaintiff's claims.  Because *Dish Network* is an on-point final order, this Court must, under the Hobbs Act, find its reasoning controlling.  28 U.S.C. § 2342(1); *La Vox Radio de la Communidad v. F.C.C.*, 223 F.3d 313, 317-20 (6th Cir. 2000); *see also CE Design, Ltd. v. Prism Bus. Media, Inc.,* 606 F.3d 443, 446 (7th Cir. 2010) ("[T]he Hobbs Act prevents the district court from reviewing the validity of FCC regulations.").

Application of *Dish Network* in this matter is straightforward.  The record is absolutely clear that while Defendants authorized B2B to send facsimiles on their behalf, they only did so based upon B2B's representation that its list only contained the names of those recipients who consented to receiving unsolicited

23

facsimiles.[10]    Plaintiff has proffered no conflicting evidence and instead emphasizes the collaborative nature of the fax design process:

> Here, the evidence shows that Defendants worked closely with B2B to create and design two fax advertisements and authorized B2B to send those advertisements on their behalf.  Defendants spoke with B2B on multiple occasions regarding several advertisement drafts and paid for B2B to send out two separate fax blasts.  At a minimum, these facts are more than sufficient to create a material issue of fact as to whether B2B sent the faxes "on behalf of" Defendants.

(Plf's Resp., Dkt. # 120, at 19).  The scope of Defendants' participation in the design and approval of the various facsimiles is not disputed by Defendants, and more importantly, is not material to the issue of *to whom the facsimiles were to be sent*.  B2B's representation as to the recipients' consent defined B2B's authority, and B2B's subsequent actions to the contrary fell outside the scope of the agency agreement.  Accordingly, Plaintiff has proffered no facts that would warrant a dispute of material fact as to general agency principles.[11]

---

[10] To be sure, statements made to Defendants by B2B certainly implicate hearsay considerations.  This is a non-issue, however, because Plaintiff failed to raise any evidentiary objections to the Court's consideration of these materials.  *Wiley v. United States,* 20 F.3d 222, 226 (6th Cir. 1994) ("If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to be waived."); *see also Brady v. City of Westland*, --- F. Supp. 2d ---, 2014 WL 632585, at *2 n.3 (E.D. Mich. 2014) (Rosen, C.J.).

[11] The Court is aware of other decisions involving B2B matters declining to enter summary judgment where the scope of authority was in dispute.  *See, e.g., Creative Montessori Learning Ctr. v. Ashford Gear, LLC*, 2014 WL 865963, at *4 (N.D. Ill. Mar. 3, 2014); *Savanna Grp.*, 2013 WL 4734004, at *6-7; *Bridgeview Health Care*

The "apparent agency" and "ratification" theories fare no better, with only the former requiring a brief analysis.[12]  Apparent agency cannot apply here because there are no record facts establishing that Plaintiff believed *B2B was acting on Defendants' behalf*.  *Palm Beach Golf*, 2013 WL 5972173 at *10 ("The Restatement forthrightly provides that '[a]pparent authority is not present when a third party [Plaintiff] believes that an interaction is with an actor who is a principal.'") (quoting Restatement (Third) of Agency § 2.03(f) (alteration in original).[13]  Plaintiff does not address this core issue and instead directs the Court to consider two paragraphs in *Dish Network* that the FCC expressly crafted to provide guidance as to whether there is apparent authority.  From this guidance, Plaintiff suggests Defendants are liable under apparent authority principles because a "seller should be 'liable . . . for those calls made by a third-party telemarketer when it has authorized the telemarketer to market its goods or services.'"  (Plf's

---

*Ctr.*, 2013 WL 1154206, at *6-7; *Imhoff Investment, LLC*, 2014 WL 172234, at *6-7.  As discussed in text, however, the record in this case does not raise any material factual disputes sufficient to prohibit the entry of summary judgment.

[12] Plaintiff neither argues that Defendants ratified B2B's conduct, nor does the record reflect that Defendants had full knowledge of the necessary facts and circumstances to demonstrate their intent to *adopt* B2B's illegal conduct.  *See Trs. Of Plasters Local 67 Pension Trust Fund v. Martin McMahon Plastering, Inc.*, 844 F. Supp. 2d 843, 855-56 (E.D. Mich. 2012) (Lawson, J.); *Palm Beach Golf*, 2013 WL 5972173, at *10.

[13] The lack of Plaintiff's belief in this regard defeats its argument that "secret agreements" between an agent and a principal "do not and cannot absolve the principal of TCPA liability."  (Plf's Resp., Dkt. # 120, at 19-20) (citing *Dish Network*, 28 F.C.C. at 6586 n.102).

Resp., Dkt. # 120, at 17) (citing *Dish Network*, 28 F.C.C. at 6592).

The problem with Plaintiff's argument here is two-fold.  First, these "two paragraphs . . . are offered for guidance only[. . . . T]he FCC has agreed that they have no binding effect on courts, are not entitled to deference under *Chevron USA Inc. v. NRDC, Inc.*, 467 U.S. 838 (1984), and that their 'force is dependent entirely on [their] power to persuade.'"  *Creative Montessori Learning Ctr.*, 2014 WL 865963, at *3 (*quoting Dish Network LLC v. Federal Commc'n Comm'n,* --- F. App'x ---, 2014 WL 323660, at *1 (D.C. Cir. 2014)).  Second, even if persuasive, other portions of the guidance -- which Plaintiff conveniently omits -- highlight the importance of *scope of authority*:

> [A] seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

*Dish Network*, 28 F.C.C. at 6592.  Given the Court's discussion about B2B's authority and, independently, because Plaintiff has set forth no facts establishing that Plaintiff believed B2B was acting on Defendants' behalf, Plaintiff cannot show apparent authority.

Finally, Plaintiff's protestation that a holding declining to impose vicarious liability will encourage businesses to "'outsource' illegal activity to unsupervised third parties" (Plf's Resp., Dkt. # 120, at 20) ignores the factual realities of *this*

26

matter.  The material facts show that Defendants neither hired B2B with the intent of *violating* the TCPA, nor did they know (or reasonably should have known) that B2B was violating the TCPA on their behalf; rather, they hired B2B with the intent of *complying* with the TCPA.   Accordingly, Plaintiff's exaggeration that this holding makes the TCPA "a dead letter" is not well-taken.  (*Id.*).  This is especially true given that Plaintiff's counsel *knew* B2B's facsimiles were not compliant with the TCPA before they filed this litigation.  It is disingenuous, therefore, to suggest that this Court's holding leaves Plaintiff without recourse.  Plaintiff's counsel's choice to use B2B as a vehicle to attach TCPA liability to Defendants instead of seeking to hold B2B directly liable was likely a strategic choice, but a choice that is not without consequences.

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment [Dkt. # 117] is GRANTED;

IT IS FURTHER ORDERED that Plaintiff's Second Amended Complaint is dismissed, with prejudice.

27

IT IS FURTHER ORDERED that Plaintiff's Motion to Certify Class [Dkt. #

109] is DENIED as moot.

**IT IS SO ORDERED.**


Dated:  May 9, 2014                    s/Gerald E. Rosen_____
                                       Chief Judge, United States District Court


I hereby certify that a copy of the foregoing document was served upon the parties
and/or counsel of record on May 9, 2014, by electronic and/or ordinary mail.

                                       s/Julie Owens_____
                                       Case Manager, (313) 234-5135